NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230097-U

NO. 4-23-0097

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 28, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.W., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Winnebago County |
| (The People of the State of Illinois, | ) | No. 21JA278 |
|     Petitioner-Appellee, | ) | |
|     v. | ) | Honorable |
| Lashana P., | ) | Francis M. Martinez, |
|     Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Knecht and Turner concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court granted appellate counsel's motion to withdraw and affirmed
the trial court's judgment terminating respondent's parental rights because no
meritorious issues could be raised on appeal.

¶ 2     On February 1, 2023, the trial court entered an order terminating the parental rights

of Moses W. and Lashana P., the parents of K.W. (born July 2021). Respondent, Lashana P., timely

appealed, and her appointed appellate counsel has now moved to withdraw pursuant to *Anders v.*

*California*, 386 U.S. 738 (1967). *See In re S.M.*, 314 Ill. App. 3d 682, 685-86 (2000) (holding

*Anders* applies to termination of parental rights cases and outlining the procedure that appellate

counsel should follow when seeking to withdraw). Because Moses W.'s appeal is addressed in

appellate court case No. 4-23-0122, this order is limited to addressing respondent's contentions on

appeal.

¶ 3　　　　　Appellate counsel's notice of filing and proof of service indicate she sent a copy of the motion to withdraw to respondent by mail. More than 30 days have passed, and respondent has not filed a response.

¶ 4　　　　　In her brief, appellate counsel contends appeal of this case presents no potentially meritorious issues for review. After reviewing the record and counsel's motion, we grant the motion to withdraw and affirm the trial court's judgment.

¶ 5　　　　　　　　　　　　　　I. BACKGROUND

¶ 6　　　　　　　　　　　　A. The Neglect Petition

¶ 7　　　　　On July 21, 2021, the State filed a petition seeking an adjudication that K.W. was a neglected minor under the provisions of section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)) in that respondent failed to cure the conditions that brought K.W.'s siblings into care, thereby placing K.W. at risk of harm.

¶ 8　　　　　On July 22, 2021, the trial court held a shelter care hearing to determine whether probable cause existed to believe K.W. was abused, neglected, or dependent. See 705 ILCS 405/2-10(2) (West 2020). The court appointed one attorney to represent respondent and another attorney to represent Moses W. After the court explained the proceedings, both attorneys met with their new clients. Immediately thereafter, both respondent and Moses W. chose to waive their right to a hearing. The court entered an order finding probable cause to believe that K.W. was neglected and that it was "a matter of urgent and immediate necessity" that she be placed in shelter care.

¶ 9　　　　　At the October 2021, evidentiary hearing on the neglect petition, Michelle French, of the non-profit care agency Shelter, Inc., testified she was the caseworker for K.W. and respondent's three other minor children, all of whom were in court-ordered care. The oldest, a five-year-old, was taken into care at birth as the result of the death of an older sibling. The

Department of Children and Family Services (DCFS) took respondent's later-born children into care because respondent had not cured the conditions that had resulted in the older child's removal. Respondent engaged in some, but not all, of the services recommended under the service plan and had ceased engaging in some of those services prematurely. French testified that the goal for the older children was substitute care pending a ruling on termination of parental rights. DCFS had placed K.W. in Cook County with one of her older siblings.

¶ 10    French testified that respondent was allowed weekly virtual visits with K.W. and had attended all but two or three visits.

¶ 11    Blake Box, a DCFS investigator, testified she met with respondent just after K.W. was born. The hospital contacted DCFS because respondent had cesarean section scars but initially denied having other children. Further, when questioned about the scars, respondent stated she had six other children who were not in her care. Respondent told Box she had older children who had been removed from her care. Respondent said she did not know the name of the caseworker for those children and gave inaccurate information about some aspects of her position with respect to those children.

¶ 12    Respondent testified that she had completed the recommended services. She believed her visits with K.W. were going well. She stated she had received Social Security disability payments but was not sure what her qualifying disability was. She no longer received those payments, but she did not know why they had ended.

¶ 13    On December 7, 2021, the trial court adjudicated K.W. a neglected minor. In deeming K.W. neglected, the court concluded that because respondent had failed to comply with the service plans developed for the older children, she thus failed to correct the conditions that put K.W. at risk of harm. The court stated it could tell from respondent's testimony she was "unaware

of her present circumstances." The court made K.W. a ward of the court and granted custody and guardianship to DCFS. The court ordered both respondents to cooperate with DCFS and comply with specific terms as directed by DCFS.

¶ 14                                    B. Termination Proceedings

¶ 15         In November 2022, the State filed a petition to terminate the parental rights of respondent and Moses W. As amended, it asserted respondent was unfit in the following five counts: (count I) Failure to maintain a reasonable degree of interest, concern, or responsibility for K.W.'s welfare, (750 ILCS 50/1(D)(b) (West 2020)); (count II) Failure to protect K.W. from conditions within the environment injurious to her welfare, (750 ILCS 50/1(D)(g) (West 2020)); (count III) Failure to make reasonable efforts to correct the conditions that were the basis for the removal of K.W. during a nine-month period following the adjudication of neglect, from December 7, 2021, to September 7, 2022, and/or January 11, 2022, to October 11, 2022, (750 ILCS 50/1(D)(m)(i) (West 2020)); (count IV) Failure to make reasonable progress to correct the conditions that were the basis for the removal of K.W. during a nine-month period following the adjudication of neglect, from December 7, 2021, to September 7, 2022, and/or January 11, 2022, to October 11, 2022, (750 ILCS 50/1(D)(m)(ii) (West 2020)); (count V) Abandonment of K.W. (750 ILCS 50/1(D)(a) (West 2020)).

¶ 16                                         1. *Unfitness*

¶ 17         The hearing on the State's allegations of unfitness took place in December 2022, when K.W. was 16 months old. Respondent, despite having told her lawyer she would appear by Zoom, was not present at the hearing. Moses W. did not appear and was not in contact with his lawyer. The court took judicial notice of its own orders. It admitted the integrated assessment and four service plans by stipulation.

- 4 -

¶ 18    C'erra Mack, who became the case manager in March 2022, testified her agency had recommended parenting classes and coaching, individual therapy, random drug screenings, and domestic violence education for respondent. Respondent completed her individual therapy within the domestic violence classes. She was inconsistent about appearing for random drug testing. The service she did not complete was parenting coaching because that could be provided only during visits, and respondent did not visit K.W. regularly.

¶ 19    The agency had concerns about respondent's parenting skills based on her difficulty with caring for K.W. and concerns relating to her mental health. Respondent had received a referral for a psychiatric evaluation in an earlier phase of the DCFS proceedings but had rejected it, saying it was unnecessary.

¶ 20    Moreover, respondent did not display any attachment to K.W. In May 2022, respondent did not recognize K.W. during a Zoom call. Mack believed respondent's last visit with K.W. was in October 2021. Although Mack was uncertain, she agreed that respondent had not called to schedule a visit in the time that Mack had been the caseworker. Respondent remained entitled to visits but repeatedly failed to confirm them. Mack never received a call from respondent seeking to confirm a visit. Respondent never brought gifts for K.W. and did not inquire about her health or progress. She twice requested photographs of K.W.

¶ 21    The agency made regular attempts to contact respondent by calls and texts. Respondent's availability was "very inconsistent[ ]." Respondent made regular contact to request that Mack add money to the bus pass.

¶ 22    Mack agreed that the psychological evaluation of respondent indicated that she had an intellectual disability and adaptive deficits.

¶ 23    The State asked the trial court to find that it had met its burden counts on I, III, and IV.

¶ 24    The trial court announced its fitness findings on February 1, 2023. A hearing on K.W.'s best interests immediately followed. Both respondent and Moses W. were present in court.

¶ 25    The trial court ruled that the State had proven both parents' unfitness by clear and convincing evidence. It found that, because respondent did not visit K.W. regularly, she had been unable to complete a critical "parenting coaching" service. Thus, "although [respondent] did provide certificates to some services, those were not sufficient to correct conditions that led to the removal of the child during those relevant nine-month periods." Furthermore, "having stopped any and all communication with the minor and visitation, no progress toward reunification could have been made." It ruled that the State had proved the three counts on which it proceeded.

¶ 26                        2. *The Child's Best Interests*

¶ 27    During the best interests portion of the hearing, the State simply asked the trial court to take judicial notice of its unfitness findings.

¶ 28    Taishi Neuman, the person with whom DCFS had placed K.W. and her older brother, represented that K.W. called her "Mama" and her husband "Da." Her husband was a long-distance trucker, but frequently participated in video calls with the children. She said K.W. was "spoiled arm to arm." She wanted to adopt K.W.

¶ 29    The trial court concluded it would be in K.W.'s best interests to terminate the parental rights of both respondent and Moses W. According to the court, even if either parent succeeded in becoming fit, that process would take an unreasonably long time. Thus, it would not be in K.W.'s best interests to delay permanency. Further, K.W. had bonded with Neuman and recognized her placement as her home. It was therefore in K.W.'s best interests to remain with

Neuman with a goal of adoption. The court therefore granted the State's motion and terminated the parental rights of both respondent and Moses W.

¶ 30　　　　Respondent appealed, and this court appointed counsel to represent her on appeal. Appellate counsel now moves to withdraw, asserting that any argument respondent could make on appeal would be without merit.

¶ 31　　　　　　　　　　　　　II. ANALYSIS

¶ 32　　　　In *S.M.*, 314 Ill. App. 3d at 685-86, this court held that counsel seeking to withdraw from representation of a respondent appealing the termination of his or her parental rights must follow the procedure set out in *Anders*. Under *S.M.* and *Anders*, counsel's request to withdraw must " 'be accompanied by a brief referring to anything in the record that might arguably support the appeal.' " *S.M.*, 314 Ill. App. 3d at 685 (quoting *Anders*, 386 U.S. at 744). Counsel must (1) briefly set out the arguments supporting any issues that she could conceivably raise on appeal, (2) explain why she concludes that those arguments are frivolous, and (3) conclude the case presents no viable grounds for appeal. *S.M.*, 314 Ill. App. 3d at 685. Counsel should review both the unfitness finding and the best interest determination and indicate in the brief that she has done so. *S.M.*, 314 Ill. App. 3d at 685-86.

¶ 33　　　　Appellate counsel avers she has reviewed the record on appeal and concluded an appeal in this case would be without arguable merit. Counsel has addressed whether the trial court's unfitness finding and best interests determination were in error. She concludes it would be frivolous to argue that the trial court erred in either determination. We have reviewed the record, and we agree. For the reasons that follow, we agree this appeal presents no issues of arguable merit, grant counsel's motion to withdraw, and affirm the trial court's judgment.

¶ 34　　　　　　　　　A. The Bifurcated Termination Standard

¶ 35 Under the Act, "the involuntary termination of parental rights involves a two-step process" (*In re C.W.*, 199 Ill. 2d 198, 210 (2002)):

> "First, there must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act [citation]. If the court makes a finding of unfitness, the court then considers whether it is in the best interests of the child that parental rights be terminated." *C.W.*, 199 Ill. 2d at 210 (citing (750 ILCS 50/1(D) (West 1998)).

¶ 36                                      B. The Finding of Unfitness

¶ 37 Appellate counsel has addressed whether respondent could argue that the trial court's finding of unfitness was against the manifest weight of the evidence. She concludes that (1) it would be frivolous to argue that the court erred in finding that respondent failed to make reasonable progress towards correcting the conditions that were the basis for K.W.'s removal and (2) it would thus be frivolous to argue that the finding of unfitness as a whole was in error. We agree.

¶ 38 Section 1(D) of the Adoption Act (750 ILCS 50/1 (D) (West 2020)) sets out more than 20 bases on which a trial court can find a parent to be unfit. The trial court here found respondent unfit under, *inter alia*, section 1(D)(m)(ii) (750 ILCS 50/1(D)(m) (West 2020)), which provides that a parent is unfit if he or she fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." "[A]ny *one* ground [for finding unfitness], properly proven, is sufficient to enter a finding of unfitness." (Emphasis in original.) *In re C.W.*, 199 Ill. 2d at 210.

¶ 39 A trial court should measure the reasonableness of a parent's progress against what must occur before a child can safely return to the parent. *In re C.N.*, 196 Ill. 2d 181, 213-14 (2001).

"[T]he overall focus in evaluating a parent's progress toward the return of the child [must] remain[ ], at all times, on the fitness of the parent in relation to the needs of the child." *C.N.*, 196 Ill. 2d at 216. " 'Reasonable progress' is an objective standard that relates to making progress toward the goal of returning the child to the parent." *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001).

¶ 40       When a trial court has found the existence of clear and convincing evidence of a parent's unfitness, a reviewing court may reverse only if it concludes the finding was against the manifest weight of the evidence. *C.N.*, 196 Ill. 2d at 208.

¶ 41       Here, counsel is correct that it would be frivolous to argue that the trial court's finding that respondent failed make reasonable progress towards K.W.'s return was against the manifest weight of the evidence. The State alleged respondent was unfit for failing to make reasonable progress toward the return of K.W. during the nine-month periods from December 7, 2021, to September 7, 2022, and/or January 11, 2022, to October 11, 2022. Here, although respondent did participate in some recommended services, Mack testified her visits to K.W. had ceased by March 2022. Mack further testified that respondent could receive parenting coaching only during visits with K.W. Mack's testimony implied that parenting coaching was the service that might remedy respondent's lack of aptitude as a parent. Defendant's cessation of visits to K.W. thus prevented her from making any progress towards K.W.'s return. Therefore, respondent's failure to visit K.W. regularly prevented respondent from making *any* progress toward K.W.'s return.

¶ 42                              C. Best Interests

¶ 43       Appellate counsel has also addressed whether respondent could argue that the trial court's finding of unfitness was against the manifest weight of the evidence. She concludes it would be frivolous to make such an argument. We agree.

- 9 -

¶ 44 In *In re J.B.*, 2019 IL App (4th) 190537, ¶¶ 32-33, this court explained both what a trial court must consider in making a best interests determination and how we review such a determination as follows:

> "[T]he trial court must consider, within the context of the child's age and developmental needs, the following factors:
>
>> (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. [Citations.]
>
> A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. [Citation.] An appellate court will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence. [Citation.] A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result." (Internal quotation marks omitted.)

¶ 45    Here, the trial court based its best interests determination principally on K.W.'s bond with her foster family and her need for a permanent placement. It stated that, even assuming respondent could become a fit parent, such change would not come quickly. It found that K.W.'s best interests lay in a secure, permanent home.

¶ 46    We agree it would be frivolous to argue this determination was against the manifest weight of the evidence. Each of the 10 factors we set out in *J.B.* either supports the trial court's determination, is inapplicable to a child of K.W.'s age, or is neutral. Factors 4, 7, and 10 strongly support the court's determination. Factors four and seven support K.W.'s remaining permanently with Neuman. K.W. had an affectionate relationship with Neuman and had spent her whole life with her brother and Neuman's children. Factor 10 also supported that determination. Neuman wanted to adopt K.W. Further, the evidence indicated that K.W. had no bond with respondent.

¶ 47                            III. CONCLUSION

¶ 48    For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 49    Affirmed.